STATE OF NORTH CAROLINA                IN THE GENERAL COURT OF JUSTICE
                                          SUPERIOR COURT DIVISION
COUNTY OF MECKLENBURG                     19-CVS-_____

CAROLINA FIRE CONTROL, INC.,

    Plaintiff,

v.                                              COMPLAINT

MARKEL CORPORATION and
EVANSTON INSURANCE COMPANY,

    Defendants.

        EXHIBIT 1

Plaintiff Carolina Fire Control, Inc., complaining of Defendants, alleges and says as follows:

## PARTIES, JURISDICTION AND VENUE

1. Plaintiff Carolina Fire Control, Inc. ("CFC") is a North Carolina corporation with its principal office located in Cabarrus County, North Carolina.

2. Defendant Markel Corporation is, upon information and belief, a Virginia corporation with its principal place of business located in Glen Allen, Virginia.

3. Defendant Evanston Insurance Company ("Evanston Insurance") is, upon information and belief, an Illinois corporation with its principal place of business located in Deerfield, Illinois. Upon information and belief, Evanston Insurance is a subsidiary or related entity of Markel Corporation. For purposes of this Complaint, Evanston Insurance and Markel Corporation are collectively referred to herein as "Evanston."

4. This Court has jurisdiction over the parties and the subject matter of this action.

5. Venue is proper in Mecklenburg County because the work performed by CFC, and insured by Evanston, is located here.

1

6. The amount in controversy exceeds $25,000.

## FACTUAL ALLEGATIONS

### *The UNCC Laurel Hall Dormitory Project*

7. CFC is a family-owned business located in Concord, North Carolina that designs, fabricates, and installs automatic fire sprinkler systems in a variety of structures, including commercial buildings, manufacturing plants, office buildings, and multi-unit residential buildings.

8. From approximately 2014-15, Balfour Beatty Construction, LLC ("Balfour Beatty") served as the general contractor for a project involving the construction of a multi-story student dormitory building (the "Laurel Hall Project") on the campus of the University of North Carolina at Charlotte ("UNCC").

9. CFC subcontracted with Balfour Beatty on the Laurel Hall Project. In or about March 2015, CFC designed and installed fire sprinkler systems throughout the Laurel Hall dormitory.

10. The fire sprinkler system that CFC installed is commonly referred to as a "wet pipe" system, which consists of closed-type sprinkler heads and pressurized water standing in the pipes at all times. In the event of a fire, individual sprinkler heads are activated by heat from the fire, such that the system discharges only in the area or areas where fire is detected.

11. In its design of the sprinkler system for the Laurel Hall Project, CFC utilized chlorinated polyvinyl chloride ("CPVC") pipes that would be run through openings in the walls, near the ceilings, of the dormitory rooms. CFC's design called for the small gaps between the CPVC pipes and each wall penetration (through which the pipes traveled) to be sealed using a smoke and acoustic sealant or caulk known as HILTI CP-506 (the "Sealant").

2

12. The Sealant was manufactured by Hilti Corporation ("Hilti") or one of its affiliate or subsidiary entities. Hilti is, upon information and belief, a multinational company headquartered in the small European country of Liechtenstein that develops, manufactures, and markets for sale various construction and building materials, including the Sealant.

13. Upon information and belief, at the time CFC incorporated the Sealant in its design for the Laurel Hall Project, Hilti had not issued to its customers or to the general public any product specifications, data sheets, technical letters, or like literature suggesting that the Sealant was in any way incompatible for use with CPVC piping.

14. The Laurel Hall Project was substantially completed in or about September 2015.

15. In or about 2017, Hilti published certain literature to the general public stating that the Sealant was incompatible with CPVC piping. At no time did CFC ever receive notice of a product recall or like notification from Hilti (or any related entity) informing CFC that the Sealant was incompatible with CPVC piping.

16. Upon information and belief, in or about January 2019, UNCC students and/or employees first observed water leaking from the fire sprinkler system in the Laurel Hall dormitory.

17. Upon information and belief, the water leaks from the fire sprinkler system caused certain damage to personal property and the interior living space of approximately thirteen (13) units in the dormitory.

18. Upon information and belief, UNCC commissioned an independent, third-party investigation of the leaking sprinkler system, and such investigation concluded the water leaks occurred on the CPVC piping specifically at the locations where the Sealant was applied. Upon

3

information and belief, the Sealant is incompatible with the CPVC piping and, over time, caused the pipe to degrade and eventually fail, resulting in the water leaks.

19. Upon information and belief, UNCC notified Balfour Beatty that water was leaking from the fire sprinkler system and claimed that the leaks constituted deficient work and/or materials under the prime contract for the Laurel Hall Project, requiring Balfour Beatty to remediate or correct the defective work and/or materials under the warranty provisions of the prime contract.

20. Balfour Beatty in turn notified CFC about the leaking fire sprinkler system.

21. On or about April 26, 2019, Balfour Beatty tendered the leaking fire sprinkler system to CFC as deficient work within the scope of work set forth in CFC's subcontract for the Project.

22. Upon information and belief, UNCC demanded of Balfour Beatty, and Balfour Betty in turn demanded of CFC, that the deficient work and/or materials relating to the sprinkler system be remediated while the Laurel Hall dormitory is vacant during UNCC's summer recess. Pursuant to the demands of the general contractor and the owner, and the warranty provisions of its subcontract for the Project, CFC began work on May 13, 2019 to remove and replace the deteriorating CPVC piping and Sealant throughout the <u>entire</u> dormitory, not just the 13 units already impacted by water leaking from the sprinkler system.

23. Upon information and belief, UNCC deactivated the fire sprinkler system in the Laurel Hall dormitory to prevent further water leaks from occurring while students occupied the dormitory for the remainder of the spring 2019 semester. Upon information and belief, UNCC instituted a 24-hour fire watch protocol, at substantial expense to UNCC, in order to guard against fire while the sprinkler system was inactive and the dormitory was occupied.

4

## *The Evanston Policy*

24. Effective for the year beginning October 24, 2014 through October 24, 2015, CFC purchased a commercial general liability insurance policy from Evanston, bearing policy number 3C06128 (the "Evanston Policy"). CFC purchased the Evanston Policy to insure CFC against the various claims that can arise with respect to the operation of a business that designs, sells, installs, and maintains fire suppression systems in newly-constructed, reconstructed, and repaired buildings and structures.

25. The Evanston Policy contains, among other things, a $1 million individual occurrence limit, and a $2 million aggregate limit for products and completed operations.

26. The Evanston Policy provides, in pertinent part:

SECTION I – COVERAGES

COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY

1. Insuring Agreement

> a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage"[1] to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. . . . We may, at our discretion, investigate any "occurrence"[2] and settle any claim or "suit" that may result. . . .
>
> b. This insurance applies to "bodily injury" and "property damage" only if:
>
> > (1) The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory"[3];

---

[1] Section V(17) of the Evanston Policy defines "property damage" as: "a. Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or b. Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the 'occurrence' that caused it."

[2] Section V(13) of the Evanston Policy defines "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions."

[3] Section V(4)(a) of the Evanston Policy defines "coverage territory" as, among other things, the United States of America.

(2) The "bodily injury" or "property damage" occurs during the policy period; and

(3) Prior to the policy period, no insured . . . and no "employee" authorized by you to give or receive notice of an "occurrence" or claim, knew that the "bodily injury" or "property damage" had occurred, in whole or in part. . . .

2. Exclusions[4]

This insurance does not apply to:

. . .

j. Damage To Property

"Property damage" to:

. . .

(4) Personal property in the care, custody or control of the insured;

(5) That particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the "property damage" arises out of those operations; or

(6) That particular part of any property that must be restored, repaired or replaced because "your work"[5] was incorrectly performed on it.

. . .

l. Damage To Your Work

"Property damage" to "your work" arising out of it or any part of it and included in the "products-completed operations hazard".

This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor.

---

[4] The exclusions set forth in the Evanston Policy are hereinafter collectively referred to as the "Policy Exclusions."

[5] Section V(22) of the Evanston Policy defines "your work" as: "(1) Work or operations performed by you or on your behalf; and (2) Materials, parts or equipment furnished in connection with such work or operations [and includes:] (1) Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of 'your work', and (2) The providing or failure to provide warnings or instructions."

6

27. The Evanston Policy purchased by CFC contains a "Miscellaneous Professional Liability Coverage" endorsement (the "Endorsement"). The Endorsement expressly alters, and in some instances completely replaces, portions of the Policy. The Endorsement provides, in pertinent part:

A. The following is added to Section I – Coverages:

MISCELLANEOUS PROFESSIONAL LIABLITY

1. Insuring Agreement

a. We will pay those sums that the insured becomes legally obligated to pay as "damages"[6] because of "injury"[7] arising out of a "wrongful act"[8] committed by the insured or any other person for whose "wrongful acts" the insured is legally liable, to which this insurance applies. We will have the right and the duty to defend the insured against any "suit" seeking "damages". . . . We may, at our discretion, investigate any report of a "wrongful act" and settle any claim or "suit" that may result. . . .

b. This insurance applies to "damages" only if:

(1) The "damages" are caused by a "wrongful act" that takes place in the "coverage territory";

(2) The "wrongful act" occurs during the policy period; and

(3) Prior to the policy period, no insured . . . and no "employee" authorized by you to give or receive notice of a "wrongful act" or claim, knew that the "injury" had occurred, in whole or in part. . . .

---

[6] Section E(1) of the Endorsement adds to the Evanston Policy the definition of "damages," which "means a monetary judgment, award or settlement."

[7] Section E(2) of the Endorsement adds to the Evanston Policy the definition of "injury," which "means 'bodily injury', 'property damage' or 'personal or advertising injury'."

[8] Section E(3) of the Endorsement adds to the Evanston Policy the definition of "wrongful act," which "means any actual or alleged negligent act, error or omission in the rendering of or failure to render the professional services shown in the Schedule of this endorsement [design of fire suppression systems], including the furnishing of food, beverages, mediations or appliances in connection with those operations."

7

28. Section 2 of the Endorsement sets forth numerous exclusions (collectively referred to as the "Endorsement Exclusions") to the professional liability coverage provided under the Endorsement. Multiple exclusions set forth in the Endorsement are duplicative of exclusions that are separately identified in the Policy. Such overlap between the Endorsement Exclusions and the Policy Exclusions underscores that the two sets of Exclusions are not to be construed together but rather are stand-alone provisions, with the Endorsement Exclusions applying exclusively to the professional liability coverage.

## *The Coverage Dispute*

29. CFC's inclusion of the Sealant in its professional design work constitutes the "wrongful act" triggering coverage under the Endorsement. More specifically, CFC designed a fire sprinkler system for the Laurel Hall dormitory that utilized the Sealant. Although Hilti did not disclose the Sealant to CFC or the general public as being incompatible for use with CPVC piping until approximately two years after the Laurel Hall Project was substantially completed, CFC's design nevertheless called for the use of the Sealant. Utilizing a material that was incompatible with CPVC piping constitutes an allegedly negligent act, error, or omission in the rendering of professional services, and falls squarely within the Endorsement's definition of a "wrongful act."

30. The aforementioned "wrongful act" occurred in or about March 2015, which was during the policy period (October 24, 2014 through October 24, 2015), and it occurred within the "coverage territory" (the United States of America).

31. CFC and its employees had no knowledge that any "injury" or "property damage" had occurred prior to the beginning of the policy period.

32. CFC is legally obligated to incur and/or pay "damages" in connection with the settlement reached by UNCC, Balfour Beatty, and CFC for remedying the "injury" or "property damage" that resulted from the "wrongful act."

33. After receiving notice from Balfour Beatty, CFC's insurance broker first contacted Evanston regarding the leaking sprinkler system on or about February 15, 2019. At that time, CFC notified Evanston about the leaking sprinkler system and submitted a claim for coverage.

34. CFC met all express conditions for coverage with respect to the claim involving the leaking sprinkler system.

35. Under the Endorsement, Evanston is required to pay damages incurred by CFC as a result of the "wrongful act," up to and including the limit of liability, in resolution of the claim relating to the Laurel Hall Project.

36. The Endorsement contains no exclusions that bar professional liability coverage for the claim relating to the Lauren Hall Project.

37. As of April 17, 2019, Evanston had not informed CFC of its claim decision. On or about April 17, 2019, CFC learned that Evanston had denied CFC's claim based on the general liability coverage set forth in the Evanston Policy months earlier but had failed to inform CFC. At best, that denial was specious because Evanston failed to even consider the professional liability Endorsement that alters and/or replaces portions of the Evanston Policy, including the Policy Exclusions.

38. For nearly four months after CFC submitted its coverage claim to Evanston, Evanston appeared to do nothing with respect to investigating the issues raised by the claim or articulating Evanston's position regarding coverage.

9

39. On or about May 28, 2019, Evanston, through its claims service manager, transmitted a "Reservation of Rights" letter to CFC. Evanston's Reservation of Rights acknowledges, in part, that "the current allegations may assert a design defect constituting a 'wrongful act' under the policy." However, the Reservation of Rights is problematic in numerous respects. Evanston states that it will investigate the claim, but it also states that "coverage is not triggered or is otherwise excluded" because the design decisions may have been made prior to the policy period. Further, the Reservation of Rights incorrectly cites the Policy Exclusions for the proposition that such Exclusions preclude coverage; as set forth above, only the Endorsement Exclusions apply, if at all, to the professional liability coverage. As such, CFC still has not received a determination from Evanston with respect to coverage.

40. Evanston did not timely conduct a good faith investigation of the "wrongful act" that CFC reported, nor did Evanston settle the resulting claim by the owner and/or the general contractor.

41. CFC disputed Evanston's coverage determination and provided Evanston with ample evidence establishing the "wrongful act" that should have triggered the professional liability coverage in this case, including without limitation furnishing Evanston with a copy of the independent report that concluded the water leaks in the CPVC piping occurred where the incompatible Sealant was applied.

42. Evanston ignored all of the facts at hand, failed to timely investigate same, and (at least initially) denied coverage. Subsequently, Evanston has wrongfully declined to timely determine that professional liability coverage exists under the Endorsement, despite the fact that CFC has repeatedly informed Evanston that time is of the essence because the remedial work began on May 13, 2019 pursuant to demands by the general contractor and the owner.

43. CFC brings this action seeking (1) a judgment declaring that professional liability coverage under the Endorsement extends to the above-described claim, and (2) recovery of compensatory and punitive damages for Evanston's bad faith conduct.

## FIRST CLAIM FOR RELIEF
(Declaratory Judgment)

44. CFC restates and incorporates by reference the allegations set forth in the preceding paragraphs.

45. There exists a real and justiciable controversy between CFC and Evanston as to whether professional liability coverage under the Endorsement extends to the alleged "wrongful act" of CFC utilizing the incompatible Sealant in the design of the Laurel Hall sprinkler system.

46. CFC seeks and is entitled to a declaration pursuant to Rule 57 of the North Carolina Rules of Civil Procedure and the North Carolina Declaratory Judgment Act (N.C. Gen. Stat. § 1-253, *et seq.*), declaring that the Policy Exclusions do not apply to the Endorsement, and the Endorsement provides professional liability coverage for the "wrongful act" of utilizing the Sealant for the Laurel Hall Project.

## SECOND CLAIM FOR RELIEF
(Breach of Contract and Implied Covenant of Good Faith and Fair Dealing)

47. CFC restates and incorporates by reference the allegations set forth in the preceding paragraphs.

48. The Evanston Policy and Endorsement collectively constitute a valid and enforceable contract supported by valid and sufficient consideration.

49. CFC complied with all of its material duties and obligations under the Evanston Policy and Endorsement (collectively, the "Contract").

11

50. In addition to its express terms, the Contract includes an implied covenant of good faith and fair dealing that requires Evanston to, among other things, refrain from conduct impairing CFC's right to receive the benefits to which CFC is entitled under the Contract.

51. Evanston materially breached the Contract, and the covenant of good faith and fair dealing implied therein, in at least the following ways:

   a. Evanston failed to consider its own professional liability Endorsement, which materially alters and/or replaces portions of the Evanston Policy (including the Policy Exclusions), in initially denying the claim;

   b. Evanston failed to timely conduct a good faith investigation of the claim, failed to settle the resulting claim by the owner and/or general contractor, and has failed to articulate its position regarding coverage despite receiving notice of such claim more than four months ago;

   c. Despite not having investigated the claim, Evanston represented in its Reservation of Rights that coverage is not triggered or is otherwise excluded, and it has incorrectly represented to CFC that the Policy Exclusions preclude coverage; and

   d. Evanston has demonstrated remarkable indifference to consequences befalling its insured, based on Evanston's failure to timely investigate or settle the claim irrespective of CFC's repeated emphasis that time is of the essence because of the timetable for remedial work demanded by the general contractor and the owner.

52. As a direct and proximate result of Evanston's breach of the Contract and the implied covenant of good faith and fair dealing therein, CFC is entitled to recover an amount to be proven at trial but believed to be at least $25,000, plus interest at the legal rate from the date of Evanston's breach.

## THIRD CLAIM FOR RELIEF
### (Unfair Trade Practices – N.C. Gen. Stat. § 75-1.1, *et seq.*)

53. CFC restates and incorporates by reference the allegations set forth in the preceding paragraphs.

54. Evanston's conduct, described above, constitutes *per se* violations of, at a minimum, N.C. Gen. Stat. §§ 58-63-10 and 58-63-15(11)(a, b, d, f, n).

55. Evanston's conduct was in bad faith and constitutes substantial aggravating factors to its material breach of the Contract.

56. Evanston's actions were in and affecting commerce.

57. Evanston's actions were unfair and deceptive within the meaning of the Unfair Trade Practice Statute, N.C. Gen. Stat. § 75-1.1, *et seq.*

58. As a direct and proximate result of Evanston's unfair and deceptive trade practices, CFC has been damaged in an amount to be proven at trial but believed to be at least $25,000, plus interest.

59. As a result of Evanston's conduct, CFC is entitled to recover its actual, consequential, and incidental damages, plus treble damages pursuant to N.C. Gen. Stat. § 75-16, as well as its reasonable attorneys' fees pursuant to N.C. Gen. Stat. § 75-16.1.

## FOURTH CLAIM FOR RELIEF
### (Insurance Bad Faith)

60. CFC restates and incorporates by reference the allegations set forth in the preceding paragraphs.

61. As set forth in detail above, Evanston has failed and refused to timely extend coverage and pay the claim relating to the Laurel Hall Project, despite acknowledging the validity of such claim and the existence of a "wrongful act."

62. Evanston's conduct constitutes bad faith in that Evanston's refusal to pay the claim is not based on an honest disagreement or an innocent mistake.

63. Evanston's conduct constitutes aggravated conduct in that it has willfully, under circumstances of rudeness or oppression, and/or in a manner evincing a reckless and wanton disregard of CFC's rights, failed to timely investigate and extend coverage for the reported "wrongful act" months after CFC reported it, and despite time being of the essence with respect to the general contractor's and owner's demand that CFC's remedial work begin on May 13, 2019.

64. Evanston's conduct is tortious, in bad faith, and is aggravating and outrageous under North Carolina law, in that the conduct was willful, wanton, and in conscious disregard of its duties and obligations under the Contract.

65. As a direct and proximate result of Evanston's bad faith conduct, Evanston should also be required to pay punitive damages pursuant to N.C. Gen. Stat. § 1D-1, *et seq.*, for its willful, wanton, intentional, and malicious conduct.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Carolina Fire Control, Inc. respectfully requests that the Court enter judgment:

1. Declaring that the Policy Exclusions do not apply to the Endorsement, and the Endorsement provides professional liability coverage for the insured's "wrongful act" of utilizing the incompatible Sealant for the Laurel Hall Project;

2. Entering judgment in CFC's favor on its breach of contract and implied covenant of good faith and fair dealing claim against Evanston, awarding CFC damages in an amount exceeding $25,000, plus interest at the legal rate from the date of Evanston's breach;

3. Entering judgment in CFC's favor on its unfair trade practices claim against Evanston, awarding CFC its actual, consequential, and incidental damages, plus treble damages and its reasonable attorneys' fees;

4. Entering judgment in CFC's favor on its insurance bad faith claim against Evanston, awarding CFC punitive damages for Evanston's bad faith insurance practices;

5. Taxing the costs of this action against Evanston;

6. For a trial by jury; and

7. For all such other and further relief that the Court deems just and equitable.

This the 21st day of June 2019.

JAMES, McELROY & DIEHL, P.A.

_____
Richard B. Fennell, NC Bar No. 17398
Adam L. Horner, NC Bar No. 32732
Christopher T. Hood, NC Bar No. 41320
525 N. Tryon St., Suite 700
Charlotte, NC 28202
Telephone: (704) 372-9870
Facsimile: (704) 333-5508
E-mail: rfennell@jmdlaw.com
ahorner@jmdlaw.com
chood@jmdlaw.com
*Attorneys for Plaintiff Carolina Fire Control, Inc.*